IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:08-HC-2061-D

UNITED STATES OF AMERICA,      )
                               )
     Petitioner,               )   RESPONDENT'S PROPOSED FINDINGS
                               )   OF FACT AND CONCLUSIONS OF LAW
v.                             )      (Local Civil Rule 52.1)
                               )
ROBERT PAUL BOYD,              )
     Respondent.               )

     NOW COMES Respondent, by and through undersigned counsel,

and proposes the following findings of fact and conclusions of

law.


I.  <u>Introduction</u>

     This cause is before the court on the United States of

America's petition to have Robert Paul Boyd ("Respondent")

certified as sexually dangerous pursuant to the Adam Walsh Child

Protections and Safety Act of 2006 ("Adam Walsh Act").  18

U.S.C. § 4247-4248.

     The government ("Petitioner") filed the initial petition,

Docket Entry ("D.E.") 1, against Respondent on April 30, 2008.

Boyd filed a motion for a hearing (D.E. 19) on December 17,

2010.

The court conducted a two-day evidentiary hearing on January 26th and 27th, 2012.  After considering the testimony presented at that hearing, the evidentiary record, and the arguments of counsel, the court concludes that the government has failed to establish by clear and convincing evidence that Respondent Robert Paul Boyd is sexually dangerous to others.  18 U.S.C. §§ 4247(a)(5)-(6).

II.  <u>Findings of Fact</u>

A. Respondent's History

1. Respondent Robert Paul Boyd is a 57 year-old man in the custody of the United States Bureau of Prisons.  At the time of the filing of the government's certification, Boyd was serving a 125-month sentence following his conviction for Receipt of Materials Depicting the Sexual Exploitation of Minors.  (N.D. Ohio Case No. 1:99CR336)(Petitioner's ("Pet.") Exhibit 10).  Boyd's projected release date was May 12, 2008.

2. The court notes at the outset that the historical record of Respondent's childhood and early adulthood is unclear.

3. Respondent was born to Norma and George Boyd in Michigan.  At the age of three or four years he was adopted by Donald and Elmira Stalkamp.  (Respondent's ("Resp.") Exhibit 2, pg. 4) His adoptive family raised Respondent in Kalamazoo and Plainwell, Michigan.  (<u>Id</u>.).

4. Respondent reports having his first sexual experiences with a male peer at age 10 or 11. _Id_. Respondent's sexual relationship continued with this same peer until the peer became interested in girls. (Pet. Ex. 2, at 1210).

5. At the age of 14 or 15 Respondent ran away from his adoptive parents and lived with his biological mother in Three Rivers, MI. _Id_. From that time until he joined the Marines at age 17, Respondent did not have a stable residence but instead lived in foster care until enlisting in the Marine Corps in April of 1973. (Pet. Ex. 11, at 113).

6. Respondent dropped out of high school before joining the Marines but did graduate from Plainwell High School in 1977 after his military service concluded. (Resp. Ex. 2 at 5).

7. Respondent served as a material clerk in the United States Marine Corps from 1973 to 1977. _Id_. He was honorably discharged for medical reasons in December 1976. _Id_.

8. While on active duty with the Marine Corps, Respondent married his first wife. The marriage was annulled after one year.

9. Respondent's honorable discharge from the Marine Corps was related to his hospitalization at two Naval Hospitals. During this hospitalization in 1976 Respondent was diagnosed with schizophrenia and pedophilia. _Id_. Respondent's sexual conduct

with minors in Hawaii apparently led to his hospitalization. _Id_.

10. After leaving the Marine Corps, Respondent returned to Michigan. He married his second wife, Karen. They were married for two years and had one son, Chad. _Id_. After divorcing Karen, Respondent moved to Texas.

11. In Texas Respondent moved in with Alice and developed a sexual relationship with her. Alice had one son from a previous relationship. _Id_. Respondent was convicted of sexually assaulting this boy and the boy's friend in 1983. (Pet. Ex. 11 at 101).

12. After serving almost four years in the Texas Department of Corrections from October 26, 1983 to July 22, 1987, Respondent moved to Key West Florida. _Id_.

13. Respondent worked at a Radio Shack and part-time for a video store while he lived in Key West. (Resp. Ex. 2 at 4). On December 21, 1988 he pled guilty to three counts of Lewd and Lascivious Acts with minors in Monroe County Circuit Court. Respondent was sentenced to fifteen years imprisonment followed by ten years of probation. He was released from prison on December 21, 1997. (Pet. 11 at 101).

14. Upon his release Respondent relocated to 4207 Tommy Lane, Ontario, Ohio and on December 29, 1997 his probation

supervision transferred from Florida to the Richland County
Probation Office in Mansfield, Ohio.  <u>Id</u>.

15. Respondent was arrested for violating the terms of his
Florida Probation and returned to Monroe County Jail.
Respondent spent seven months confined in the jail before his
violation hearing.  (Resp. Ex. 2 at 7).  Respondent's
probation was terminated by the court and he was released on
November 24, 1998.  (Pet. Ex. 11 at 110).  Respondent then
relocated to 3900 S. Tampa Avenue, Apartment B in Orlando,
Florida.  <u>Id</u>. He was arrested on December 1, 1999 for Receipt
of Materials Depicting the Sexual Exploitation of Minors and
transported back to Ohio.  (Pet. Ex. 12 at 1029).

16. Respondent was originally sentenced to 188 months following
his guilty plea in the U.S. District Court for the Northern
District of Ohio.  (Pet. Ex. 9).  After an appeal he was
resentenced to 125 months of imprisonment to be followed by
five years of supervised release.  (Pet. Ex. 10).

B. Criminal History and Sexual Offense History

Non-Sexual Criminal Convictions

17. Respondent's first criminal conviction occurred in Raleigh,
N.C. at the age of 18.  Respondent served 45 days for
Malicious Damage. (Pet. Ex. 11 at 100).

18. On September 3, 1980 Respondent was convicted of Harboring a Fugitive in Grand Traverse County, Michigan. (<u>Id</u>.). He served 21 days in custody and paid a $100 fine. (<u>Id</u>.).

19. On May 26th, 1983 Respondent pled guilty to theft. Adjudicaton was deferred for one year of probation. (<u>Id</u>.).

Sexual Offense History

20. Aggravated Sexual Assault and Sexual Abuse, Montgomery County, Texas 1983. While cohabitating with a woman named Alice in Conroe, Texas, Respondent began sexually assaulting her 13 year-old son. The Presentence Investigation Report (Pet. Ex. 11 at 100-101) prepared in Respondent's federal child pornography case states that Respondent admitted to making the victim "participate in acts of oral sodomy as the passive partner" from May, 1983 until his arrest in September, 1983. (<u>Id</u>. at 101). Over Labor Day weekend, Respondent also sexually molested the 13 year-old's friend, also 13, who was spending the night. (<u>Id</u>.). Again according to the Presentence Investigation Report, Respondent "forced the friend to allow him to masturbate him and perform acts of oral sodomy as the active partner on him." (<u>Id</u>.). Respondent was arrested and charged with Aggravated Sexual Assault on September 7, 1983. (<u>Id</u>.). He pled guilty on October 26, 1983 and was released on July 22, 1987. (<u>Id</u>. at 100).

21. Sexual Abuse, Montgomery County, Texas 1983.  On September 24, 1983, while in jail after his arrest for Aggravated Sexual Assault, Respondent was charged with leading a group of inmates in a sexual assault of a 19 year-old inmate.  (Id.).  Respondent continues to deny he engaged in the sexual assault in the jail, and has consistently maintained that he agreed to plead guilty to the offense because his sentence ran concurrently with the sentence in the first case.  (Pet. Ex. 16 at 834; Pet. Ex. 3 at 1211).

22. Lewd and Lascivious Acts with a Child Under 16 Years, Monroe County Circuit Court, Key West, Florida 1988.  Respondent was originally charged with 10 counts of Lewd and Lascivious Acts with three victims.  (Pet. Ex. 7 at 966-976).  Each victim was a boy under the age of 16.  One of the boys was 14 years-old at the time of the offense, the ages of the other two victims are not known.  (Id. at 967).  Respondent videotaped himself having oral and anal sex with two separate victims.  (Id. at 2035-38).  On another occasion Respondent and a juvenile male masturbated in front of other juvenile males.  (Id.).  The 10 year-old brother of one of the victims watched a video of his older brother masturbating while in Respondent's residence. (Pet. Ex. 11 at 103).

23. Receipt of Receipt of Materials Depicting the Sexual Exploitation of Minors, 18 U.S.C. § 2252(a)(2) and (b)(1), Northern District of Ohio No. 1:99CR336. Respondent moved to Ohio in December 1997 after his release from prison in Florida. (Pet. Ex. 11 at 97). His probationary term was transferred to Mansfield, Ohio. (Id.). During a visit to Respondent's home a probation officer questioned Respondent about his computer. (Id.). During a subsequent search probation officers found evidence Respondent was accessing the internet and downloading pornography. (Id.). After an investigation the government charged Respondent with receiving and downloading between two and three thousand images that included minor males engaged in sexually explicit conduct. (Id.). The Presentence Investigation Report prepared in that case describes the images as follows: "actual and simulated oral-genital and genital-anal sexual intercourse, masturbation, and a lascivious exhibition of genitals and pubic areas." (Id.). While the specific number is unknown, according to the Presentence Investigation Report a substantial number of the pictures showed prepubescent males. (Id.).

24. Attorney Edward G. Bryan, Respondent's attorney, submitted a letter to the court that was included in the Presentence

Investigation Report. (Pet. Ex. 11, at 113-115). Mr. Bryan's investigation of Respondent's personal history presented a number of inconsistencies between the version of events provided by the Respondent and records uncovered by Mr. Bryan's office. (Id.). In addition, Mr. Bryan referred Respondent to Sandra B. McPherson, Ph.D., who prepared a psychological report on Respondent. (Id. at 114). Dr. McPherson's findings were included in the Second Addendum to the Presentence Report. She diagnosed Respondent as follows: Axis I: Dysthymic Disorder; Axis II: Personality Disorder NOS with borderline, possible dissociative psychopathic and antisocial traits. (Id.).

C. Bureau of Prisons Disciplinary History

25. Respondent has no history of disciplinary infractions in the Bureau of Prisons prior to being housed at FCI Butner in 2008. (See Resp. Exs. 5-9).

26. Since coming to FCI Butner after the government filed its petition in this case, Respondent has received multiple disciplinary infractions.

27. On September 12, 2008 staff searched Respondent's cell for contraband. (Pet. Ex. 17 at 825). During that search a number of items were confiscated. These items included photographs of males, ages unknown, in various stages of

undress. The ages of the males in these pictures appear to range from prepubescent to adolescent and adult.

28. A book, <u>Dream Boy</u>, authored by Jim Grimsley, was also seized. (<u>Id</u>.). While this book was summarized by BOP staff as having to do with incest and sexual violence, the court declines to give weight to the subject matter as relevant to its decision in this case. The court finds as a fact that none of the experts who testified at the hearing in this case have independently read <u>Dream Boy</u>.

29. On five other occasions BOP staff have confiscated material from Respondent's cell. (<u>See</u> Pet. Exs. 19-23). The items seized have a consistent theme: pictures and drawings of young men, either nude or in underwear, and books or writings of an erotic nature.

30. The court reviewed a sample of these photographs. (Pet. Ex. 22, 23, and 25). These photos include, among other things, teenage males in suggestive poses.

31. On December 23, 2011 FCI Butner staff confiscated 16 books from Respondent's cell. (Pet. Ex. 23). Some of these books contain subject matter of an erotic and sexual nature.

32. Staff at FCI Butner also intercepted mail addressed to Respondent which contained materials deemed inappropriate. (<u>See</u> Pet. Ex. 24).

33. The items seized from Respondent during his time at FCI Butner indicate poor judgment on the part of Respondent. The photographs, sketches, writings, and books taken from Respondent are not in and of themselves illegal. However, Respondent has been put on notice that materials of a sexual nature or materials that depict children are not tolerated in the Maryland Unit at FCI Butner. And yet Respondent has continued to obtain sexually suggestive photos of teenage males. He has apparently continued to write stories that involve adolescents having sex. (Pet. Exs. 22 and 25).

34. The court cannot find that Respondent's behavior in FCI Butner is directly tied to a serious mental disorder which causes a loss of volitional control. Respondent's behavior can also be explained as part of a pattern consistent with Antisocial Personality Disorder. (See ¶ 45 below; Pet. Ex. 26).

35. Respondent has not engaged in sexual violence while incarcerated in the Bureau of Prisons.

D. Experts

36. Dr. Marcus Forbes prepared a Pre-Certification Report of Respondent on February 1, 2008. (Pet. Ex. 16 at 832). According to the report, Respondent participated in three clinical interviews as part of the assessment procedure.

(Id.).  Dr. Forbes diagnosed Respondent with Axis I: Pedophilia, Sexually Attracted to Males, Axis II: no diagnosis.

37. During the evidentiary hearing in this case the court heard testimony from four experts.  Three experts, Dr. M. Lela Demby, Ph.D., Dr. Gary Zinik, Ph.D., and Dr. Ashley King, Ph.D., were called to testify on behalf of the government. Dr. King was originally designated by Respondent as an additional examiner selected pursuant to 18 U.S.C. § 4247(b) (D.E. 31).  Respondent subsequently moved to withdraw Dr. King as his expert (D.E. 35) and that motion was denied (D.E. 40). Dr. King submitted her report to the court on June 22, 2011 (D.E. 43).

38. Respondent designated a second forensic examiner (D.E. 44), Dr. John Warren, Ph.D., who testified for Respondent at the evidentiary hearing.

39. The experts filed written reports with the court pursuant to 18 U.S.C. § 4247(c).

i. Clinical Diagnosis

40. Each expert's report included a clinical diagnosis in which all four expert applied the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision (2000).

41. Dr. Demby is a forensic psychologist employed by the Bureau of Prisons. In her report Dr. Demby diagnosed Respondent with Pedophilia, Sexually Attracted to Males, Non-Exclusive Type. (Pet. Ex. 5 at 14).

42. Dr. Zinik is a forensic psychologist retained by the government to evaluate Respondent. He originally diagnosed Respondent with Paraphilia Not Otherwise Specified, Hebephilia, Sexually Attracted to Males age 10-14, Exclusive type. (Pet. Ex. 2 at 1136). After having the opportunity to meet with Respondent, Dr. Zinik modified his diagnosis of Paraphilia NOS, Hebephilia from Exclusive Type to Non-Exclusive type because Respondent has had age-appropriate sexual relations with adults. (Pet. Ex. 3 at 1213).

43. Hebephilia, according to Dr. Zinik, is a sexual preference for pubescent adolescents. (Pet. Ex. 2 at 1137). Dr. Zinik distinguished Pedophilia, or the sexual preference for prepubescent children, from Hebephilia. (Id.). He acknowledged that it is normal for adult males to be attracted to postpubescent adolescents. (Id. at 1138). He then posited that sexual interest in pubescent minors becomes more deviant as the adolescent's age decreases below 14 years. (Id.).

44. Dr. Zinik acknowledged that the lines between prepubescent, pubescent, and postpubescent children are not clear. (Id.).

Dr. Zinik also recognized that the DSM-IV-TR does not recognize Hebephilia as a official paraphilia diagnosis, although a Hebephilia category has been proposed for inclusion in the DSM-V. (Id. at 1138-39).

45. Like Dr. Zinik, Dr. King also diagnosed Respondent with Paraphilia Not Otherwise Specified, Hebephilia. (Pet. Ex. 26 at pg. 15). In addition, Dr. King found Respondent to have an Axis II diagnosis of Antisocial Personality Disorder. (Id.).

46. In her report Dr. King cautioned that Hebephilia is a controversial diagnostic concept in the psychological community (Id. at 18).

47. Dr. King also opined that Paraphilia NOS may not be an appropriate diagnosis for use in a legal proceeding because "by definition the NOS category is one of atypical presentation and the use of the NOS is based largely on the judgment of the evaluator." (Id.).

48. Respondent's expert, Dr. Warren, diagnosed Respondent as Axis I: Sexual Abuser, Perpetrator, Remote History. (Res. Ex. 2 at 9). Dr. Warren found the Sexual Abuser disorder an appropriate diagnosis because Respondent "did violate the criminal law and was convicted of engaging in sexual behavior with boys under the age of legal consent." (Id. at 10). Dr. Warren further explained that the sexual abuser disorder is "a

historical notation by medical and psychological

professionals, as opposed to a psychiatric illness or sexual

deviance." (Id. at 2). Respondent, in Dr. Warren's opinion,

does not suffer from a mental disorder that "overrides his

volitional control" nor alters his ability to perceive and

manage reality. (Id.).

ii. Actuarial Instruments

49. The experts in this case used at least one actuarial

instrument in an attempt to describe how Respondent compares

to other sex offenders in terms of risk of future offending

should he be released. Each expert employed the Static-99R.

Dr. King and Dr. Zinik also used the Minnesota Sexual Offender

Screening Tool-Revised (MnSost-R). Dr. Zinik employed a third

actuarial, the Static 2002R. Dr. King employed the Static-99,

an earlier version of the Static-99R that does not account for

the offender's age. (Pet. Ex. 26 at p. 23). The Static-99R,

the Static-2002R, and the Minnesota Sexual Offender Screening

Tool-Revised (MnSost-R) have been found to have moderate

predictive accuracy. (Pet. Ex. 2 at 1140).

50. Actuarials cannot predict the recidivism rate of an

individual offender. See U.S. v. Hall, #11-7102, slip op., at

12 (4th Cir. Jan. 9, 2012). The actuarial instruments used by

the experts in this case associate Respondent with the

recidivism rate of some sample group of sex offenders with a similar score on the actuarial. The court considers expert testimony based on actuarial instruments relevant to the question of whether Respondent will have "serious difficulty in refraining from sexually violent conduct or child molestation if released." 18 U.S.C. § 4247(a)(6). However, "the ultimate question called for by the Adam Walsh Act concerns the self-control of an individual, not the statistical re-arrest patterns of a given population." U.S. v. Red Star, 5:06-hc-2222-BR, (E.D.N.C. filed January 3, 2012) (Britt,J.). The court has considered recidivism rates associated with Respondent's actuarial scores in this case, but gives them less weight than Respondent's "past and current conduct, and the testimony of the experts as a whole." (Id.).

51. Dr. Demby used the Static-99R to measure Respondent's relative risk. She scored Respondent with a total score of 7, which put him in the "high risk" category. (Pet. Ex. 5 at 1113). Dr. Demby then compared Respondent's score to the "non-routine" study sample. Offenders from that sample with a score of 7 sexually reoffend at a rate of 30.6% in five years and 39.7% in ten years. (Id.).

52. Dr. Zinik scored Respondent as an 8 on the Static-99R. (Pet. Ex. 2 at 1144, 1149). In contrast to Dr. Demby's scoring, Dr.

Zinik added 1 point to Respondent's score for Question 9 of the Static-99R, "any stranger victims." Dr. Zinik determined that Respondent's admission to sex with teenage male prostitutes met the Static-99R definition of stranger victim. (Id. at 1149).

53. Dr. Zinik scored Respondent with 8 points on the Static-2002R and 10 points on the MnSOST-R. (Id. at 1144). These scores corresponded to a High to Moderate risk level on the Static-2002R and a High risk level on the MnSOST-R. (Id.).

54. Like Dr. Demby, Dr. Zinik compared Respondent's score on the Static-99R to the non-routine sample of offenders. (Id. at 1143). Offenders from the non-routine sample of the Static-99R with a score of 8 had an estimated recidivism percentage of 37% after five years and 46% after 10 years. (Id. at 1144).

55. Dr. King used the Static-99R, the Static-99, and the MnSOST-R actuarial instruments, all of which scored Respondent in the High Risk category. (Pet. Ex. 26 at p. 23). Because the Static-99R is the one constant actuarial used by each expert, the court takes specific note of Dr. King's application of that test. Dr. King scored Respondent with raw score of 8 on the Static-99R, which placed him in the high-risk category. (Id.). Unlike Dr. Demby or Dr. Zinik, Dr. King then compared

Respondent's score to two samples:  the routine and non-routine samples.  (Id.).  Offenders from the routine sample with the same score as Respondent reoffended at a rate of 19% over five years.  However, offenders from the non-routine sample with the same score reoffended at a 31% rate over five years.  (Id.).

56. Dr. King also noted that when Respondent turns 60 his risk level will drop to the Moderate-High level and the corresponding recidivism rates after five years would drop to 11% for the routine sample and 19% for the non-routine sample. (Id. at pg. 24).

57. Dr. Warren found Respondent to have a total score of 5 on the Static-99R, placing Respondent in the Moderate-High risk category.  (Resp. Ex. 2 at 22).  Dr. Warren then compared Respondent's score to the Routine Correctional sample and found the sexual recidivism rate of an offender from that group with a score of 5 to be 11.4% in five years.  (Id.). The Routine Correctional sample is the only of the four sample groups that is the statistical equivalent of a random sample. (Id. at 20). Dr. Warren also pointed to the overall 6.5% recidivism rate for sex offenders in the U.S. between 2000 and 2007 to further contextualize Respondents risk of re-offense. (Id. at 2, 18).

E. Legal Principals

58. The Adam Walsh Act creates a mechanism by which the government can seek the civil commitment of a "sexually dangerous person" in the custody of the Bureau of Prisons. 18 U.S.C. § 4248. A "sexually dangerous person" has "engaged in or attempted to engage in sexually violent conduct or child molestation and who is sexually dangerous to others." 18 U.S.C. § 4247(a)(5). "Sexually dangerous to others" means that an individual "suffers from a serious mental illness, abnormality, or disorder as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation if released." 18 U.S.C. § 4247(a)(6).

59. To obtain a commitment order against Respondent, the government must establish "three distinct facts by clear and convincing evidence: that [Respondent] (1) 'has engaged or attempted to engage in . . . child molestation' in the past, 18 U.S.C. § 4247(a)(5); (2) currently 'suffers from a serious mental illness, abnormality, or disorder'; and (3) as a result of the illness, abnormality, or disorder, "would have serious difficulty in refraining from . . . child molestation if released,' 18 U.S.C. § 4247(a)(6)." U.S. v. Hall, #11-7102, slip op., at 7-8 (4th Cir. January 9, 2012).

F. Past Violent Sexual Conduct or Child Molestation

60. The court finds by clear and convincing evidence that Respondent has engaged in "sexually violent conduct or child molestation" in the past. 18 U.S.C. § 4247(a)(5). Respondent's prior convictions in Texas and Florida for Aggravated Sexual Assault (described in ¶ 22 and 24) are acts of child molestation. All four experts agree on this point. (See Pet. Exs. 2, 5, and 26; Resp. Ex. 2). Furthermore, Respondent conceded at the evidentiary hearing that the government established the first prong of the Adam Walsh Act by clear and convincing evidence.

G. Serious Mental Illness, Abnormality, or Disorder

61. On this second element, the government has not proved by clear and convincing evidence that petitioner suffers from a serious mental illness, abnormality, or disorder. Four experts presented varying diagnoses of Respondent. The court also reviewed the opinions of Dr. Forbes (Pet. Ex. 17 at 832-837) and Dr. McPherson (Pet. Ex. at 114-115). The court concludes that Dr. Warren's opinion is most convincing. The court finds that Respondent's mental disorder, Sexual Abuse, Remote History does not meet the threshold for "serious mental illness, abnormality, or disorder."

62. That psychological professionals analyzing the same individual could come to such a wide range of opinions about his psychological state belies the evolving nature of diagnosing mental health disorders. Kansas v. Crane, 534 U.S. 407, 413, 122 S.Ct. 867 (2002). However, the statutory definition of "serious mental illness, abnormality, or disorder" does not necessarily mirror the definitions set forth in the DSM-IV-TR. U.S. v. Carta, 592 F.3d 34, 40 (1st Cir. 2010). The current disagreement amongst the psychological community regarding the "Hebephilia" diagnosis has been considered, but it is for the court to determine if Respondent suffers from the statutorily mandated mental disorder.

63. The court concludes that a diagnosis of Sexual Abuser, Remote History, in light of all the evidence presented, does not reach the level of serious mental illness, abnormality or disorder. Respondent does not suffer from a "mental disorder that overrides his volitional control...[n]or does he have any disorder that produces an illness-driven disturbance in perceiving and managing reality as experienced by others (psychosis)." (Resp. Ex. 2 at 2).

H. Serious Difficulty Refraining

64. The government must also establish that Respondent, if
released, "would have serious difficulty in refraining from
sexually violent conduct or child molestation." 18 U.S.C. §
4247(a)(6). Proof of a serious difficulty in controlling
behavior cannot be demonstrated with "mathematical precision."
Crane, 534 U.S. at 413. But evidence of the lack of
volitional control must be significant enough "to distinguish
the dangerous sexual offender whose serious mental illness,
abnormality, or disorder subjects him to civil commitment from
the dangerous but typical recidivist convicted in an ordinary
criminal case." Id.

65. Petitioner argues that Respondent's prior acts of child
molestation, receipt of child pornography, and continued
interest in adolescent males as evidence by his disciplinary
record at FCI Butner, are caused by a deviant sexual interest
that significantly impairs Respondent's volitional control.
This loss of volitional control, Petitioner claims, impacts
Respondent's ability to refrain from committing new acts of
sexual violence or child molestation if he were released. 18
U.S.C. § 4247(a)(6).

66. Respondent contends that his prior crimes and subsequent
behavior are not a sign of deviant sexual interests. An adult

homosexual male's sexual attraction to post-pubescent males is not deviant. (Pet. Ex. 2 at 1138). Acting on those attractions by engaging in sexual behavior with post-pubescent minors is, however, illegal. (Resp. Ex. 2 at 10). Respondent argues that he has *chosen* to act on his attraction to minors in the past, and has been punished for those crimes, but he does not suffer from a mental illness that impacts his volitional control. (Resp. Ex. 2 at 2). While Respondent's history of child molestation is troubling, he argues that he cannot be distinguished from the "dangerous but typical recidivist." Crane, 534 U.S. at 413.

67. Three experts, Dr. Demby, Dr. Zinik, and Dr. King, are of the opinion that Respondent would have serious difficulty in refraining from sexually violent conduct or child molestation if release. (Pet. Exs. 2, 5, and 26.).

68. Respondent's expert, Dr. Warren, found Respondent's risk for sexual re-offending to be low if released. (Resp. Ex. 2 at 11).

69. Respondent's last offense of sexual violence or child molestation occurred in 1988. (Pet. Ex. 11 at 101). He was 33 years old at the time of that offense. (Id.). Respondent is now age 57. The court finds Respondent's age to weigh

against the likelihood that he will re-offend if released. (Resp. Ex. 2 at 11; Pet. Ex. 26 at p. 22).

70. Respondent's criminal history and history of infractions while at FCI Butner show a lack of respect for authority. But it is not necessarily true that Respondent's behavior is driven by a serious difficulty in refraining from sexual violence or child molestation. The court cannot find by clear and convincing evidence that Respondent has a loss of volitional control caused by a mental illness. His behavior is instead that of a "dangerous but typical recidivist." Crane, 534 U.S. at 413.

## III. Conclusion

For the foregoing reasons, the court finds that Respondent Robert Paul Boyd is not a sexually dangerous person under the Adam Walsh Act. It is hereby ORDERED that the Attorney General immediately release Robert Paul Boyd from the custody of the Bureau of Prisons.

Respectfully submitted, this the 18th day of January, 2012

WILLIS & JOHNSON, PLLC

By:  <u>/s/ G. Ryan Willis</u>
     Attorney for Respondent
     19 W. Hargett Street, Ste. 805
     P.O. Box 2058
     Raleigh, NC 27602
     Phone: (919) 900-7668
     Fax: (919) 900-7669
     Email: ryan@willisandjohnson.com
     North Carolina State Bar # 33004
     L.R. 57.1 Counsel
     Appointed

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served upon:

Joshua B. Royster
U.S. Attorney's Office
310 New Bern Ave.
Suite 800
Raleigh, NC 27601

R.A. Renfer, Jr.
U.S. Attorney's Office
310 New Bern Ave.
Suite 800
Raleigh, NC 27601

Michael D. Bredenberg
Federal Medical Center
P.O. Box 1600
Butner, NC 27509

by electronically filing the foregoing with the Clerk of Court on January 18, 2012 using the CM/ECF system.

This the 18th day of January, 2012.

                    WILLIS & JOHNSON, PLLC

            By:  /s/ G. Ryan Willis
                 G. Ryan Willis
                 Attorney for Respondent
                 19 W. Hargett Street, Ste. 805
                 P.O. Box 2058
                 Raleigh, NC 27602
                 Phone: (919) 900-7668
                 Fax: (919) 900-7669
                 Email: ryan@willisandjohnson.com
                 North Carolina State Bar # 33004
                 L.R. 57.1 Counsel
                 Appointed